# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *
SHERRY LERWICK, legal            *
representative of a minor child, *
B.L.,                            *        No. 06-847V
                                 *        Special Master Christian J. Moran
            Petitioner,          *
                                 *
v.                               *        Filed: June 30, 2014
                                 *
SECRETARY OF HEALTH              *
AND HUMAN SERVICES,              *        Damages; attendant care; living at
                                 *        home; statutory interpretation.
            Respondent.          *
* * * * * * * * * * * * * * * * * * * *
```

<u>Curtis Webb</u>, Twin Falls, ID, for petitioner;
<u>Darryl R. Wishard</u> and <u>Michael P. Milmoe</u>, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED RULING REGARDING COMPENSATION[1]

B.L. is a profoundly handicapped ten-year-old. His mother, the petitioner in this case, established that a vaccine caused his neurological disabilities. <u>Entitlement Ruling</u>, 2011 WL 4537874 (Fed. Cl. Spec. Mstr. Sept. 8, 2011). Ms. Lerwick is entitled to compensation from the National Childhood Vaccine Injury Compensation Program.

The parties have agreed upon most of the elements of compensation except for two disputed aspects. The first disputed issue is whether it is reasonably necessary for B.L. to have a licensed vocational nurse (LVN) present with him 24

---

[1] Pursuant to a February 24, 2014 order, the child's name has been redacted. The parties may request additional redactions pursuant to 42 U.S.C. § 300aa-12(d)(4)(B); Vaccine Rule 18(b). In the absence of an additional request for redaction, this ruling will be posted in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002).

hours a day, every day.  For reasons explained in section IV., Ms. Lerwick has not established that this much coverage, which would be a considerable jump from B.L.'s current level of care, is reasonably necessary.

The second issue is where B.L. will live.  Ms. Lerwick proposes at her home.  The Secretary counters with a plan that, ultimately, does not provide sufficient compensation for Ms. Lerwick to care for her son in her home.  The alternative is for B.L. to live at one of the homes for developmentally disabled people in California.  This issue presents both a legal question and a factual question.  As explained in section V., the question of law is resolved in Ms. Lerwick's favor.  She wants B.L. to be in her house and she is entitled, as a matter of law, to receive sufficient compensation for that purpose.  However, if the proper interpretation of the statute grants special masters discretion to award compensation that is reasonably necessary to B.L.'s well-being (but not necessarily sufficient for B.L. to stay at home), then the Secretary's plan would be adopted.

## I.    Background

### A.    B.L.

Dr. Montoya, B.L.'s long-time pediatrician, succinctly summarized B.L.'s abilities:  "[B.L.] needs help with every activity."  Tr. 1018.  Dr. Lubens, a doctor the Secretary retained to examine B.L., had the same impression.  B.L. is "profoundly handicapped so that he's totally dependent in all areas of life: feeding, dressing, self-help, … eating, bathing, personal safety, everything."  Tr. 1274.  The Secretary's life care planner, Ms. Laura Fox, also stated that "[B.L.] needs total care.  He needs somebody to help him through all his activities of daily living."  Tr. 1517.

Dr. Lubens diagnosed B.L. as suffering from severe cerebral palsy and treatment resistant epilepsy.  Exhibit D at 6; Tr. 1251.  The cerebral palsy is a sequela to the vaccine-caused acute disseminated encephalomyelitis (ADEM)  and has impaired B.L.'s neurologic functioning at every level.  Tr. 1325-26.  He "communicates like an infant, a pre-toddler infant."  Tr. 1300.  B.L. has the ability to recognize his mother and when he sees her, he "can express joy and excitement."  Tr. 1300.

Ms. Lerwick purchased her family's current home in 2009, when B.L. was four years old.  Then, B.L. was transported in a stroller.  Tr. 1437.  The house is a two-story home, located on a cul-de-sac.  On the second floor are a second family room, Ms. Lerwick's bedroom, and a bathroom with a deeper bathtub.  When Ms.

Lerwick wants B.L. in any of these locations, she must carry him up the stairs.  Tr. 1439; see also Tr. 1123-24 (Ms. Lerwick's description of how she moves B.L.).

Although B.L. has some difficulties with the physical structure of Ms. Lerwick's house, the parties anticipate that the award of compensation will allow Ms. Lerwick to modify her home.  See exhibit 108A (bid for home modifications), Tr. 1398-99.  Ms. Lerwick stated that she plans to stay in this house for at least five years.  The house has some advantages, including an adequate school district and a nearby firehouse.  Tr. 1453, 1457.

At home, B.L. resides with his mother and his sister.  Tr. 1235.[2]  B.L. currently has an emotional connection to his mom.  The spark between them is readily apparent in a video Ms. Lerwick submitted.  Exhibit 126.  Other witnesses recognized the bond between Ms. Lerwick and her son.  Tr. 1031 (Dr. Montoya), 1152 (Dr. Sankar).  Ms. Lerwick also testified that B.L. has positive social interactions with his cousins and neighbors.  Tr. 1445.

B.L.'s disabilities have not prevented him from attending school.  He is the subject of an individualized education program.  Exhibit 127; exhibit 139.  The school system is responsible for providing a licensed vocational nurse for the 10 students in B.L.'s classroom.  However, according to Ms. Lerwick, the school system has not always fulfilled its obligation and B.L. has missed school days.  Tr. 1122-26, 1419; see also Tr. 1561 (Ms. Fox).  In the two most recent complete school years, out of 179 days of school, B.L. has been entirely absent 26 days in 2012, and 31 days in 2013.  Exhibit 135 at 2, 6.

## B.     Current Arrangement for B.L.'s Care

All of B.L.'s needs are factors in the assistance various public entities provide to Ms. Lerwick.  She resides in the State of California, which has promoted care for developmentally disabled people for decades.  A program called Medi-Cal EPSDT pays for an LVN to come to Ms. Lerwick's home for 140 hours per month.  A separate program, administered through California's regional centers, provides 30 hours of LVN coverage for Ms. Lerwick to have a respite from caring for B.L.  Exhibit 107; Tr. 1112-13, 1253.  Together, these two

---

[2] Ms. Lerwick is divorced from B.L.'s father, who sees his son occasionally.  Tr. 1459; exhibit 133 (divorce stipulation).

programs equal approximately 40 hours of LVN assistance per week.  Tr. 1113, 1282-83, 1570.

The licensed vocational nurses who assist Ms. Lerwick are employed by a private agency, Premier Healthcare Services.  A physician signs a plan of care authorizing the nurses working for that agency to perform the tasks listed on the care plan.  Tr. 1525, 1571-72.  Here, Dr. Montoya signed a plan of care instructing the nurse to provide certain medications, to take various standard safety precautions such as adequate lighting and emergency preparedness, to use precautions against aspiration at all times, and to assess B.L.'s respiratory and neurologic functions, etc.  Exhibit 107 at 9-12.

At Ms. Lerwick's direction, the LVN helping her sometimes accompanies B.L. to school.  A private nurse for B.L. duplicates, in some respects, the nursing services that the school already provides.  Ms. Lerwick has found that the needs of the 10 students in B.L.'s class can overwhelm the nurse caring for them.  Thus, she devotes some of her nursing hours to time when B.L. is at school.  Tr. 1419.

A third program offers additional aid to Ms. Lerwick, although not necessarily LVN coverage.  The California Department of Social Services gives Ms. Lerwick an allotment of money to pay for in-home supportive services (IHSS).  Ms. Lerwick decides how to use this money.  Although Ms. Lerwick could spend this money to purchase (expensive) nursing hours, she chooses to pay herself to care for B.L.  Since her hourly rate is commensurate with the hourly rate for an unlicensed person, the IHSS money purchases more hours of her time.  Exhibit 107; Tr. 1114, 1253-54.  In July 2013, the IHSS money was the equivalent of approximately 190 hours of unlicensed care per month (approximately 44 hours per week).  Exhibit 107.  However, due to a reduction in services in August 2013, Ms. Lerwick's allotment will equal only about 156 hours per month (approximately 36 hours per week).  Tr. 1114, 1424.  A non-licensed person, sometimes known as a home health aide, can perform tasks like repositioning, grooming, and bathing.  Tr. 1519.

The effect of all these services has been to keep B.L. safe in Ms. Lerwick's home.  Tr. 1050 (Dr. Montoya).  For example, the fact that B.L. has not been hospitalized for aspirational pneumonia could be attributed to the excellent care he receives.  Tr. 1154, 1545-46.

While B.L. has not worsened in the last few years, he also has not improved in any significant manner.  The vaccine-induced ADEM inflicted severe and

permanent damage to his brain.  Consequently, over the past two years that Dr. Montoya has acted as B.L.'s pediatrician, Dr. Montoya has not seen any improvement.  Tr. 1014, 1060.  Likewise, Dr. Raman Sankar, B.L.'s pediatric neurologist at U.C.L.A., stated that B.L.'s condition is "stable" and he does not expect any noticeable progress.  Tr. 1138.

Unfortunately, B.L.'s abilities are unlikely to improve in any meaningful way.  Dr. Sankar predicted that 15 years from now, B.L. would not be able to do any more for himself (Tr. 1171) an opinion shared by Dr. Lubens (Tr. 1298).  Thus, B.L. requires a comprehensive plan to care for him throughout his life.  The parties dispute the best ways to address B.L.'s needs.

## II.    Procedural History

Ms. Lerwick filed her petition on December 12, 2006.  A September 8, 2011 ruling set forth the relevant procedural history during the entitlement phase of the case and found that Ms. Lerwick was entitled to compensation.

In September 2011, the parties started to determine the amount of compensation to which Ms. Lerwick is entitled.  See order, issued Sept. 27, 2011.  To assist her in this process, Ms. Lerwick retained Re-Entry Inc., a business owned by Helen Woodard.  With the assistance of an associate, Amy Weaver, Ms. Woodard obtained some updated medical records and school records about B.L.  Ms. Lerwick provided a schedule of B.L.'s day, listing time spent eating, performing six types of exercises, being cleaned, and attending therapy.  Exhibit 63 at 4.  Ms. Woodard incorporated this material into a life care plan, which was filed as exhibit 60 on April 23, 2012.  Ms. Woodard proposed, among other things, that B.L. receive 24 hours of licensed nursing care a day for the remainder of his life, which he would spend in Ms. Lerwick's house.  Ms. Woodard's original life care plan did not offset the cost of any item with an amount from insurance.

Between April and August 2012, Ms. Lerwick filed into the record various materials that the staff from Re-Entry had obtained.  Exhibits 62 through 105.  After Ms. Woodard presented her life care plan, the Secretary's life care planner, Ms. Fox, saw B.L. at his home and school.  Ms. Weaver accompanied Ms. Fox on this site visit.

On September 10, 2012, the Secretary presented a comprehensive motion to amend the schedule, which had required the Secretary to file a responsive life care plan by September 10, 2012.  The government proposed that Ms. Woodard amend her life care plan to include offsets for insurance.  The Secretary also stated that

she was exploring the possibility of retaining a doctor to examine B.L.  Ms. Lerwick filed an amended life care plan on September 28, 2012, as exhibit 106.

Dr. Perry Lubens, a neurologist whom the Secretary retained, examined B.L. on February 20, 2013.  On March 21, 2013, the Secretary filed Dr. Lubens's resulting report as exhibit D.  The Secretary also provided Dr. Lubens's report to Ms. Fox.

The Secretary filed two documents from Ms. Fox on May 6, 2013.  The first document, exhibit E, is a six-page narrative nursing assessment.  The other document, exhibit F, is a comprehensive response to the petitioner's life care plan. Ms. Fox did not agree with Ms. Woodard's recommendation for 24-hour licensed nursing care.  Ms. Fox also recommended that at age 25, B.L. should live in a residential facility, not Ms. Lerwick's house.  Exhibit F at 7-8.

The differing life care plans were discussed at an ensuing status conference on May 28, 2013.  Ms. Lerwick represented that the parties were "worlds apart on the most important issue" − whether B.L. needed 24-hour licensed care.  Ms. Lerwick recommended scheduling a hearing in early September 2013.  Ms. Lerwick proposed that she and Ms. Woodard would testify at the hearing. Additionally, Ms. Lerwick indicated that other witnesses might include directors of nursing facilities and B.L.'s treating neurologist.  The Secretary agreed with the scheduling of a hearing in September and indicated that she planned to offer testimony from Ms. Fox and Dr. Lubens.  Additionally, the Secretary stated that she might find administrators of residential facilities to testify.

Once the case was being scheduled for a hearing, Ms. Lerwick took two steps.  First, she made a legal argument by filing a motion for summary judgment. Ms. Lerwick argued, as a matter of law, that she should be awarded a sufficient amount of compensation to allow for B.L. to remain in her house.  Additional briefs were filed on this topic.  For the details of those arguments, see section V. below.

Second, Ms. Lerwick developed the factual basis for her contentions.  For example, on July 15, 2013, Ms. Lerwick filed responses from two of B.L.'s treating doctors, Dr. Sankar and Dr. Montoya, to a questionnaire developed by Re-Entry.  Exhibit 110A; exhibit 110B; exhibit 110C; exhibit 111A; exhibit 111B. Staff from Re-Entry had developed this questionnaire without any input from Ms. Fox.  Ms. Lerwick also filed an affidavit from B.L.'s nurse, Maricel Seiwert. Exhibit 112.

The Secretary also made a legal and factual response.  She submitted a letter from Michael Cutchshaw, a director of operations for ResCare, which operates residential facilities in California.  Exhibit G.  She also submitted other material regarding residential placements.  Exhibits H through K.

Throughout August 2013, and continuing through early September 2013, the parties filed additional evidence.  Exhibit L is an amended life care plan from Ms. Fox, listing areas of agreement and disagreement in the two life care plans.[3] Exhibit 126 is a video depicting how B.L. lives.  This "day-in-the life" video was very effective in communicating the extent of B.L.'s abilities.

On September 12, 2013, a telephonic hearing was conducted.  The only witness was Dr. Montoya.  The hearing resumed in San Diego, California on September 17, 2013, and concluded the next day.  Ms. Lerwick, Ms. Woodard, Dr. Lubens, and Ms. Fox appeared in person.  Dr. Sankar and Mr. Cutchshaw testified via telephone.

After the hearing, the parties filed briefs.[4]  As directed by an April 3, 2014 order, the parties made supplemental submissions on April 18, 2014.  Thereafter, the parties filed additional material on April 23, 2014 and May 9, 2014.  These filings make the case ready for adjudication.

## III.   Standards for Adjudication

The pertinent statutory language for compensation states:

> Compensation . . . for a vaccine-related injury . . . shall include the following:

---

[3] In their life care plans, the parties have agreed to compensate Ms. Lerwick for the unreimbursed portion of the cost of the many types of therapies B.L. receives.  Similarly, B.L. sees multiple doctors, Tr. 1033 (Dr. Montoya), 1460 (Ms. Lerwick), and there is no dispute about these items.  Exhibit 131.

[4] Ms. Lerwick was awarded $325,000.00 in compensation on an interim basis.  That sum represents a portion of the amount to which she is entitled.  2014 WL 1897656 (Fed. Cl. Spec. Mstr. Apr. 16, 2014).

7

(1)(A)  Actual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses which

(i) result from the vaccine-related injury for which petitioner seeks compensation,

(ii) have been or will be incurred by or on behalf of the person who suffered such injury, and

(iii)(I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or

(iii)(II) have been or will be for rehabilitation [etc].

42 U.S.C. § 300aa—15(a).  A critical aspect is that the item of care be "reasonably necessary."

Special masters have characterized this phrase as a "vague instruction" and a standard for which there is "no precise" definition.  Bedell v. Sec'y of Health & Human Servs., No. 90-765V, 1992 WL 266285, at *4 (Cl. Ct. Spec. Mstr. Sept. 18, 1992).  A very early decision in the Vaccine Program explained that the term "reasonably necessary" means

that an award should provide compensation beyond that which is required to meet the basic needs of the injured person in the compensable areas but short of that which may be required to optimize the injured person's quality of life.  What is reasonably necessary lies somewhere between that which is 'indispensable' and that which is 'advantageous.'

Scheinfield v. Sec'y of Health & Human Servs., No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991).  Consistent with Congress's intent that the Vaccine Program be generous, it is logical to interpret "reasonably necessary" as closer to "advantageous" than to "indispensable."  See H.R. Rep. No. 99-908, at 3 (1986), reprinted in 1986 U.S.C.C.A.N. at 6344.

After these early decisions, very few decisions in the Vaccine Program have determined whether a particular level of attendant care is "reasonably necessary."[5]

As discussed below, "the reasonably necessary" standard is the focus for determining the amount of attendant care for B.L.  In addition, the "reasonably necessary" standard seems to underlie the Secretary's position regarding whether B.L. should live at home for the remainder of his life.

## IV.   Attendant Care

As mentioned earlier, the parties have agreed upon many items in B.L.'s care plan.  For example, before the hearing, the parties agreed upon the frequency of doctors' appointments, the frequency of many types of therapy, and equipment that B.L. will use.  Exhibit 109 (supplemental life care plan) at 2.  These agreements have greatly simplified this case and the efforts of both life care planners, Ms. Woodard, and Ms. Fox, and both attorneys, Mr. Webb and Mr. Milmoe, are greatly appreciated.  However, the parties have not resolved an important issue, the amount of attendant care.

### A.     Differing Recommendations for B.L.'s Care

Ms. Lerwick and Ms. Woodard propose that an LVN should care for B.L. 24 hours a day, every day.  Exhibit 109 at 4-5; Tr. 1221.  In contrast, the Secretary and Ms. Fox suggest a plan in which different types of care-givers assist Ms. Lerwick.  Under the government's plan, B.L. will have an LVN for 8 hours every day and a home health aide for 4 hours every day, for a total of 12 hours of daily care (not including the LVN coverage provided by the school system on school days).  Exhibit L (life care plan); Tr. 1521, 1556.[6]

---

[5] The primary reason why special masters have written so few decisions addressing attendant care is that once a case reaches the stage in which damages are being determined, the parties have almost always compromised their positions.  These agreements have reduced the litigation over items of compensation.  The credit for these settlements belongs to the attorneys and the life care planners whom they employ.

[6] The financial difference between the two plans is large.  Ms. Woodard asserted that LVN care costs $37 to $55 per hour and the annual cost is $324,120 to $481,800.  Exhibit 60 at PDF 56.  Ms. Fox accepted that LVN care costs $37 per hour and allotted 8 hours.  Ms. Fox added aide level care at $18 per hour for 4 hours per day.  Ms. Fox made adjustments for respite care and care that will continue to be available through the regional center.  The total annual cost for Ms. Fox's plan was $124,472.  Exhibit L at 1-2.

The differences in recommendations reflect differences in philosophies between Ms. Woodard and Ms. Fox. The starting point for Ms. Fox is the level of care that B.L. is receiving from various California programs. Tr. 1516-17. Because Ms. Fox concluded that B.L.'s 2013 care plan (exhibit 107) was reasonable, her goal was either to continue that plan or to increase it. Tr. 1518, 1520-21. Under B.L.'s current plan, an LVN needs to be present for B.L. when Ms. Lerwick is absent because B.L. may need medication. But, when Ms. Lerwick is with B.L., there is a need for support services only. If B.L. needs medication, Ms. Lerwick can provide it to her son. Tr. 1517-20.

Ms. Woodard took a different view regarding Ms. Lerwick's contribution. She stated "it's my position that she has no obligation to provide him extraordinary care. And his extraordinary care needs occur throughout the 24 hours." Tr. 1575. Ms. Woodard explained that without 24 hour LVN coverage, Ms. Lerwick "has to wake up and attend to [B.L.'s needs]. And she does. She's alert to his needs. She checks him regularly. She looks at him on a monitor. But more importantly, she goes in to take care of whatever has happened. And it's really important to start getting back to her being able to sleep like regular people sleep, not wake up every hour and a half or two hours." Tr. 1573-74.

Since the submission of petitioner's life care plan in April 2012, Ms. Woodard has recommended 24-hour LVN coverage. The strongest support for this recommendation in the life care plan appears to be a June 23, 2011 letter in which Dr. Sankar stated that B.L. should be under constant supervision by a qualified LVN. See exhibit 60 (life care plan) at PDF 37; exhibit 90 at 2 (Dr. Sankar's letter).[7] However, the context for Dr. Sankar's recommendation appears to be a request that the school system provide an LVN while B.L. rides the school bus because his seizures "occur primarily in the morning." Exhibit 90 at 2. Dr. Sankar did not address whether an LVN was required while B.L. was sleeping.

Dr. Sankar's testimony raised additional questions about the need for LVN assistance. Before the hearing, Dr. Sankar had written a July 12, 2013 letter to Ms. Lerwick's attorney, stating "[B.L.] requires 24 hour a day nursing care by a licensed vocational nurse." Exhibit 110A at 1. At the hearing, Dr. Sankar stated that he understood the differences among certified nurse's assistants, licensed vocational nurses, and registered nurses "to some degree." Dr. Sankar described

---

[7] Ms. Woodard's narrative also mentions a March 21, 2012 report from Maria Taylor, RN. See exhibit 60 at PDF 41.

himself as limited to saying "what the child needs.…  Whether it can be done by the LVN or the CNA is usually not my call, because that is not the bulk of my practice in the hospital."  Tr. 1134.  When questioned about the July 12, 2013 letter, Dr. Sankar stated that he specified the person providing care to B.L. had to be an LVN because "I was informed that somebody less than LVN may not be able to do what needs to be done."  Tr. 1146.

A similar pattern occurred with respect to Dr. Montoya.  In April 2012, he completed a form prepared by Ms. Woodard's staff.  Dr. Montoya stated that B.L. "will likely always require full time supervision."  Exhibit 119 at PDF 7.  Like Dr. Sankar, Dr. Montoya did not know the differences among different types of caregivers.  Tr. 1012, 1021.  When Dr. Montoya was asked specifically about his April 2012 recommendations, Dr. Montoya stated that he could not comment on whether the overnight care should be provided by a home health care aide, licensed vocational nurse, or parent.  Tr. 1077.

On the other hand, Dr. Lubens seemed knowledgeable about abilities of different caregivers from his work in advocating for his patients.  Tr. 1290-98.  Dr. Lubens's opinion was that B.L. did not require 24-hour nursing care.  Tr. 1281-86.  In explaining why B.L. did not need 24-hour nursing care, Dr. Lubens stated that B.L. "needs an adult to do the care that Dr. Sankar talked about: positioning, making sure he get his medication,… watching him carefully, even doing physical therapy on him.  I just don't think any of those things require a nurse."  Tr. 1310.  In Dr. Lubens's view, Ms. Lerwick is responsible for caring for B.L. outside of the time an LVN is present (8 hours per day) and outside of the time a home health aide is present (4 hours per day).  Thus Ms. Lerwick is responsible for B.L. during his sleeping hours.  Tr. 1328-29.

The summary above points out that the parties actually have two disputes.  The first is the number of hours of attendant care per day.  Ms. Woodard advocates for 24 hours of care.  Ms. Fox proposes 12 hours (plus other care during school).  Ms. Fox, effectively, makes Ms. Lerwick responsible for B.L.'s well-being during the nighttime hours when B.L. is sleeping.  See Tr. 1277-78, 1574-76.

The second dispute is who provides the care.  The choices are either an LVN or a home health aide.  Among the witnesses who discussed the differences between LVNs and home health aides, Ms. Fox was particularly knowledgeable because she is a nurse licensed in California and has supervised home health aides in California.  Tr. 1500-07.  Ms. Fox explained that LVNs obtain one year of post-secondary education and pass an examination to obtain a license.  In contrast,

home health aides are not required to have achieved any particular level in education, although most have graduated from high school. Home health aides attend a 60-hour training program to receive certification. Tr. 1511-12.

The educational and training differences between LVNs and home health aides are consistent with the duties that they perform. For B.L., it is important to note that LVNs are authorized to provide medication and to suction patients. These tasks and others like them are considered aspects of "skilled" nursing care. Tr. 1231-34 (Ms. Woodard), 1327 (Dr. Lubens), 1560 (Ms. Fox); Exhibit 115 (Cal. Dep't of Health Servs. Licensing & Certification Program, Nurse Assistants, Home Health Aides, Hemodialysis Technicians Certification Facts (2006)).

California does not currently provide an LVN to watch B.L. 24 hours per day. If B.L. required continual monitoring from a licensed nurse, then it seems likely that the plan of care developed through the California Regional Centers would have given Ms. Lerwick this assistance. Tr. 1517-18. Instead, California is providing 170 hours of LVN assistance per month, and approximately 195 hours of aide-level care.[8] Exhibit 107. With approximately 12 hours of assistance per day, B.L. has done about as well as possible. The lack of 24-hour nursing care has not harmed B.L. as both Dr. Montoya and Dr. Sankar testified that he has remained stable while they cared for him.

California's provision of LVN care plus aide care is influential. By all accounts, California has established an admirable system to care for developmentally disabled individuals. Tr. 1506; see Arc of California v. Douglas, 2:11-CV-02545-MCE, 2013 WL 3331675, at *2 (E.D. Cal. July 1, 2013) (greater eligibility under California's Lanterman Act than under federal HCBS waiver program) (citing Sanchez v. Johnson, 416 F.3d 1051, 1064-65 (9th Cir. 2005) (describing Lanterman Act and the services it provides)); see generally exhibit M; see also exhibit 122. Ms. Fox testified about the California system and Ms. Woodard did not contradict Ms. Fox's assessment. Tr. 1506. Thus, while California's system is not necessarily perfect, it is a reasonable starting point.

---

[8] Because the Secretary proposes either to continue or to expand this care, the parties' dispute is really about additional coverage. It is not an "all or nothing" situation.

### B.     Evaluation of Petitioner's Arguments and Evidence

To justify an increase in B.L.'s current level of attendant care beyond her current level, Ms. Lerwick points to three aspects of B.L.'s condition:  B.L.'s unpredictable seizures, B.L.'s risk for aspiration, and B.L.'s risk for bed sores.  Of these three, only seizures and aspiration require the assistance of a licensed nurse.  A licensed nurse is not needed to address B.L.'s risk of bed sores because a certified nursing assistant (CNA) is qualified to turn B.L. periodically.

### 1.     Seizures

Despite taking medication as a precaution against seizures prophylactically, B.L. has seizures unpredictably.  Tr. 1015-16, 1139-40, 1156, 1284.  He has different types of seizures.  Sometimes, his eyes glaze and he stops tracking.  Sometimes, his muscles twitch and he can go into full body convulsions.  Tr. 1201, 1472-76 (Ms. Lerwick), see also Tr. 1040-41 (Dr. Montoya).

If B.L. were to have a seizure that was not stopped, the seizure could send him into a state of status epilepticus.  This could result in further brain injury.  Tr. 1044 (Dr. Montoya).  Dr. Sankar emphasized that a short seizure is not likely to worsen the brain injury, although a prolonged seizure might.  Dr. Sankar was more worried about B.L.'s ability to breathe during any seizure.  Tr. 1143-44, 1156.

Dr. Sankar, B.L.'s treating neurologist, has provided instructions that can be implemented when B.L. has a seizure at school.  See exhibit 90 at 2-3; exhibit 124 at 1.  When B.L.'s seizure lasts more than a few minutes, his caregiver provides Klonopin, which is an oral medication.  If the Klonopin does not halt the seizure, the next medication is diazepam.  Diazepam is given rectally.  The next step is to call for emergency assistance from paramedics.  Tr. 1271; see also Tr. 1041-42 (Dr. Montoya), 1106 (Ms. Lerwick).

Ms. Lerwick has been trained to give B.L. either Klonopin or diazepam.  Tr. 1412-16 (describing the process for administering diazepam).  She estimated in the past year, she gave B.L. Klonopin 25-30 times.  On five occasions, she has given her son diazepam.  Tr. 1203; but see Tr. 1472-76 (B.L. given diazepam 12-20 times in year and a half).  Although Ms. Lerwick testified about the frequency of B.L.'s seizures requiring medication, see Tr. 1203, 1472-76, her recollection did not appear accurate.  When Ms. Lerwick reported to doctors how frequently she was administering Klonopin or diazepam, the frequency was much less.  See, e.g., exhibit 119 at 47.

To care for B.L. at school, the school system has a seizure action plan. Every child with epilepsy in California has a seizure action plan.  Tr. 1269.  In California, a teacher (not a nurse) may administer the medication to the student. American Nurses Ass'n v.Torlakson, 304 P.3d 1038 (Cal. 2013); see also Tr. 1141-42 (Dr. Sankar).

A few days before Ms. Lerwick testified, B.L. had a seizure while in school. The school nurse gave him Klonopin, then diazepam, and then called for an ambulance.  Tr. 1105-06.  The paramedics brought him to a local hospital where a doctor, working with Ms. Lerwick's assistance, assessed B.L. for baseline functioning following the seizure.  Tr. 1109-10; see also Tr. 1205, 1431-34. This seizure that B.L. had at school a few days before the hearing confirms that when adults respond to B.L. quickly, the seizure does not impair his functioning for a lengthy time.  See Tr. 1156-57 (Dr. Sankar: risks from prolonged seizures can be averted with Diastat); see also Tr. 1142 (Dr. Sankar describing the relationship between intervention time and seizure duration).  Although B.L.'s seizure was severe, the school nurse was able to recover him within 15 minutes and the paramedics arrived before the seizure ended.  Tr. 1109.  Following the seizure, B.L. was promptly transported to a local emergency room and seen by a doctor who coordinated care with B.L.'s neurologist, Dr. Sankar.  Tr. 1109-10.  Thus, although there is some possibility of harm from B.L.'s seizures, the likelihood of harm is relatively remote in light of the interventions dictated by B.L.'s seizure action plan.

Moreover, Ms. Lerwick did not testify about the frequency of seizures that occur during the night.  Cf. exhibit 119 at 22 (two seizures at night while falling asleep); exhibit 90 at 2 (Dr. Sankar letter stating that B.L.'s seizures usually happen in the morning); exhibit 98 at 52 (history from 2011, stating "seizures occurring in the AM around the same times 1030 or 0830"); exhibit 118 at 32 (2012 hospital record stating "overnight, no seizures witnessed by parents").  The nighttime seizures, if any, are the important ones because if Ms. Lerwick had established that she was often giving B.L. Klonopin and diazepam at night, then this pattern might have constituted persuasive evidence justifying the provision of a licensed nurse for the overnight hours.  To the extent that some small percentage of B.L.'s seizures happen at night and Ms. Lerwick interrupts her sleep to administer medications to him, that irregular occurrence is part of the obligations of being a parent.  See McCollum v. Sec'y of Health & Human Servs., 91 Fed. Cl. 86, 92 (2010) ("[h]ome attendant care does not, however, exempt parents from caring for their own children").  Periodically, all children will wake their parents with various complaints.  Ms. Lerwick has not demonstrated that her experience

14

with B.L. at night is sufficiently out-of-line with another parent's nighttime care to support the need for a licensed nurse for all hours of the day.

The determination that Ms. Lerwick has not met her burden of establishing that 24-hour LVN coverage is reasonably necessary is also informed by the possible harm of a seizure. Dr. Sankar explained that a seizure that medication quickly controls is unlikely to cause any neurological injury. Tr. 1143-44, 1156.

### 2.    Aspiration

Aspiration means "the drawing of a foreign substance, such as the gastric contents, into the respiratory tract during inhalation." Dorland's Illustrated Medical Dictionary 166 (32d ed. 2012). B.L. is at an increased risk for aspirating because the functioning of his muscles involved in swallowing is impaired. Tr. 1154-56 (Dr. Sankar). He could aspirate on his own saliva, preventing him from breathing. Tr. 1035, 1153-54, 1279. If B.L. aspirated when he is eating, the food could end up in his lungs where it can be a source for bacteria leading to pneumonia. Tr. 1035-36.

B.L.'s caregivers currently take precautions to minimize the likelihood of aspiration. For example, they can position him so that he is more upright. Another precaution is to thicken his food to make it easier to swallow and more difficult to aspirate. Tr. 1036, 1066, 1476. If these precautions do not prevent aspiration, and he aspirates, B.L.'s caregiver must make sure he is properly positioned and call for emergency assistance. Tr. 1144. Another response to aspiration is to use an electric pump to suction the substance out of B.L.'s respiratory tract. Tr. 1036, 1154.

The evidence about actual examples of B.L. having respiratory trouble was inconsistent. Although B.L. had been treated for pneumonia several years ago, he has not been recently hospitalized for pneumonia that could have developed as a consequence of aspirating food. Tr. 1279, 1524, 1545-46. In March 2012, B.L.'s gastrointestinal doctor, Dr. Katz, ordered a swallow study. Exhibit 66 at 21. During this testing, B.L. exhibited "no aspiration or penetration on thin and regular liquids and thin and thick purees." Exhibit 66 at 19. A second swallow study was performed the following year with similar results. Exhibit 120 at 1 ("No aspiration or penetration was observed through the exam."). In addition, B.L. appeared, in the day-in-the-life video, to be able to drink from a sippy cup and Ms. Lerwick stated that he can eat a variety of foods in a restaurant. Tr. 1436. The day-in-the-life video did not show B.L. being suctioned. Exhibit 126; see also Tr. 1277 (Dr.

Lubens).  During Dr. Lubens's appointment with B.L., Dr. Lubens did not see B.L. being suctioned.  Tr. 1277.  Similarly, during Ms. Fox's site visit to B.L.'s home and school, Ms. Fox did not see B.L. being suctioned.  Tr. 1524.

On the other hand, Ms. Lerwick told Dr. Lubens that she used the suction machine "one to five times a day."  Exhibit D at 4.  Ms. Lerwick presented a similar estimate during her testimony.  Tr. 1471, 1478-79.

B.L.'s choking on either food or saliva could conceivably lead to a terrible outcome, such as aspiration pneumonia or worse.  Tr. 1153-54.  But, 24-hour assistance from a nurse who could suction away the impediment is not reasonably necessary to prevent aspiration.  Several reasons support this finding.  First, given that the time in dispute is the nighttime period, food appears to be a minimal concern.  Presumably, Ms. Lerwick feeds B.L. hours before he goes to bed and this interval allows B.L. to digest his meal.  Ms. Lerwick did not testify about instances of B.L. choking during the night.  Second, B.L. has not recently experienced pneumonia, which could have been the result of aspiration.  See Tr. 1524, 1542, 1545.  Third, B.L.'s swallow studies did not show any evidence of aspiration.  Exhibit 66 at 19; exhibit 120 at 1.  The second and third reasons combine to support the inference that B.L. has the ability to handle the saliva his body creates.  Fourth, B.L.'s plan for care at home, signed by Dr. Montoya, did not order that B.L. be suctioned, or state that he needed suctioning.  Exhibit 107; Tr. 1525.  Fifth, the forthcoming compensation to Ms. Lerwick will include money to allow her to purchase a bed that will assist with B.L.'s positioning at night.  See exhibit N at 6, exhibit 98 at 10 (Dr. Montoya's recommendation for a bed).  All these factors contribute to finding that overnight monitoring by an LVN is not reasonably necessary to prevent aspiration.

Consequently, the two aspects of B.L.'s life that arguably implicate a need for licensed care, his irregular seizures and his potential aspiration, are unpersuasive grounds for allowing such care.  The remaining issue is whether B.L. is at such risk for skin infection either from bed sores or his incontinence that an attendant should care for him throughout the night.  If so, a CNA, not an LVN, could turn B.L. periodically to prevent bed sores and change his diaper.

### 3.    Skin Infections

The evidentiary presentations about B.L.'s risk for skin infection were not robust.  In hindsight, it appears through the hearing, the parties focused more on the two topics that would require LVN coverage and spent relatively less time on a

topic involving only home health aide care.  Nevertheless, the parties subsequently submitted sufficient evidence for a ruling regarding skin infections.

B.L.'s risk for skin infections comes from two sources.  First, B.L. is incontinent.  Second, B.L. also has some risk for developing bed sores that could lead to an infection.

The starting point for analysis is B.L.'s current status.  With respect to B.L.'s need for diapers, Ms. Woodard's life care plan provides relatively few details.  Although Ms. Woodard's 49-page life care plan includes a lengthy recitation of medical records, there are only two references to "diaper," including once in the context of B.L.'s medical history, then again in her discussion of B.L.'s current condition.  Exhibit 60 at PDF 38, 48.  Consequently, Ms. Woodard included diapers and supplies among the items that B.L. requires.  Id. at PDF 55.[9] The recommended diapers were generic, not special ones people with skin sensitivity would use.

The Secretary's witnesses were a source of more information about B.L.'s need for diapers.  During the appointment with Dr. Lubens, Ms. Lerwick told him that B.L. "uses about six [diapers] a day.  He has a bowel movement every other day.  He has never had problems with urinary tract infections."  Exhibit D at 4.  Ms. Fox learned similar facts about B.L.:  "He is reported to have diarrhea about twice a month.  He does not have urinary tract infections.  He uses a size 7 diaper and uses 5-6 per day."  Exhibit E at 3.

Medical records corroborate the accuracy of the reports from Dr. Lubens and Ms. Fox.  In July 2012, Ms. Lerwick requested that Dr. Montoya reauthorize diapers, stating that B.L. uses "4-5 diapers daily . . . size 6."  Exhibit 119 at PDF 35.  The next month, Dr. Montoya evaluated B.L.'s skin and noted "no diaper rash."  Id. at PDF 39.

The Premiere Healthcare Services plan, which was current when the hearing was held, calculates approximately five hours of "[b]owel, [b]ladder care" needed weekly, and authorizes assistance for roughly four of those hours.  Exhibit 107 at PDF 17.  This appears to indicate that nearly all B.L.'s weekly diapering needs are met by his day-time care.

---

[9] Ms. Fox did not dispute that B.L. needs diapers and supplies.  See exhibit F at 6.

The number of diapers per day suggests that B.L. is being regularly changed during the day, but not necessarily during the night.  Ms. Lerwick did not testify that she was waking to change B.L.  Rather than routine nighttime interruptions, it seems likely that B.L. "is changed on a habit schedule."  Exhibit 94 (April 2011 Temecula School District report) at PDF 9.  Thus, although B.L.'s inability to toilet himself does create a need for diapers and associated supplies, the constant presence of an attendant to clean B.L. throughout the nighttime hours while he is sleeping is not "reasonably necessary." [10]

A second risk for skin infections in B.L. is developing bed sores.  People who cannot move themselves are at risk for developing bed sores.  Tr. 1039.

Before the hearing, B.L.'s doctors had relatively little concern about his development of bed sores.  The only time doctors described a risk for bed sores was in 2012, when Dr. Montoya included this risk-factor among the justifications for a bed for B.L.  Exhibit 102 at 19.  Ms. Woodard noted Dr. Sankar's recommendation for a special bed that could elevate B.L.'s head and chest in her life care plan, exhibit 60 at 39, and also recommended the purchase of a bed.  Id. at PDF 59.  Otherwise, Ms. Woodard did not describe any medical record suggesting B.L. was at risk for bed sores and did not further propose any equipment, such as an egg carton mattress, that would minimize the likelihood of bed sores.  See exhibit 60; see also exhibit W at 3 (Ms. Fox's report noting that Ms. Lerwick did not request equipment that could prevent bed sores).

The lack of concern about bed sores may be attributable to B.L.'s history.  It appears that he has been free of bed sores.  Ms. Lerwick's briefing has not identified any medical record in which B.L. suffered from bed sores and an independent review of the records has not located any.  One 2006 record stated that B.L. has "[n]o history of skin infections."   Exhibit 98 at 356.

Although Dr. Montoya described this concern early in the hearing (Tr. 1019), the remaining witnesses did not speak to this issue very much.  Dr. Sankar confirmed that B.L.'s risk of bed sores was a factor in Dr. Sankar's recommendation for care.  Tr. 1167.  Ms. Lerwick stated that she wakens every two hours to reposition B.L.  Ms. Lerwick's checking and repositioning helps to

---

[10] Ms. Lerwick's post-hearing submissions did not point out any concerns about diapering.

maintain B.L.'s neck in a proper position and to avoid a problem in his hip.  Tr. 1197.

After the hearing, in response to an order, the parties submitted additional evidence and argument on this topic.  Ms. Fox stated "[B.L.] has some risk to develop bed sores and skin infections as he is a child who has mobility issues, is incontinent and uses diapers."  Exhibit W at 1.  Ms. Fox characterized B.L.'s risk as "low risk" because of a practice guideline.  The nursing guideline for predicting bed sores is known as the Braden scale because the original designers were Barbara Braden and Nancy Bergstrom.  On the Braden scale, the lower the number, the greater the risk for bed sores.  When Ms. Fox completed the Braden scale for B.L., Ms. Fox scored him as a 17, placing him within the "mild risk," which ranges from 15 to 18.  Exhibit W at 3.

Ms. Lerwick quickly responded to the Secretary's submission of Ms. Fox's Braden scale by submitting two Braden scale evaluations.  One came from Terin Harris, a registered nurse from Premier Healthcare Services.  The other came from Dr. Montoya.  Both Nurse Harris and Dr. Montoya scored B.L. as a 12, which falls in the high risk category of 10-12.  Exhibit 137; exhibit 138.

The Secretary submitted two more pieces of evidence, another letter from Dr. Lubens and another letter from Ms. Fox.  Exhibit X; exhibit Y.  Dr. Lubens opines that "patients such as [B.L.] with cerebral palsy have mobility, can roll over, and have sensation.  There is nothing to indicate that [B.L.] is immobile during the night hours, and cerebral palsy patients like him move and adjust positions during periods of rest and sleep."  Exhibit X at 1.  While questioning the necessity of a Braden scale for B.L., Dr. Lubens supports Ms. Fox's earlier assessment of "mild risk."  Id. at 2.

Ms. Fox did not see a basis for an aide to turn B.L. in the nighttime hours. "Turning and re-positioning while [B.L.] is sleeping was not reasonabl[y] needed in the past, and is not reasonabl[y] necessary now or in the future. . . . It is my professional opinion that [B.L.] will be better served by continuing the protocol he has enjoyed for years, having a good night['s] sleep, rather than changing it without a compelling reason."  Exhibit Y at 3.

Although Dr. Montoya's and Ms. Harris's evaluations are relevant, they do not automatically establish that B.L. is at a high risk for developing a skin infection.  The "conclusion" of any treating doctor "shall not be binding on the special master."  42 U.S.C. § 300aa—13(b)(1).  Here, the context of Dr. Montoya's

and Ms. Harris's comments is important.  Until the September 2013 hearing, they were not recommending any additional monitoring for skin infections.  The Federal Circuit has held, in the context of a resolving contract dispute, that a party's pre-litigation conduct is relevant, see Saul Subsidiary II Ltd. Partnership v. Barram, 189 F.3d 1324, 1326 (Fed. Cir. 1999), Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir.1983), and this principle also provides some standard for evaluating statements of treating doctors.  See Snyder v. Sec'y of Health & Human Servs., 88 Fed. Cl. 706, 745-46 n.67 (2009) (the testimony of a treating physician is not "sacrosanct"); Ruiz v. Sec'y of Health & Human Servs., No. 02-156V, 2007 WL 5161754, at *14 (Fed. Cl. Oct. 15, 2007) (special master was not arbitrary in rejecting a statement of a treating doctor that was given years after treatment ended and only in the context of litigation).

Dr. Montoya's recent assessment that B.L. is at high risk for bed sores appears to be consistent with his past practice of readily supporting Ms. Lerwick's request for services.  For example, Dr. Montoya recommended B.L. participate in Sky Therapy.  Exhibit 111B at 3.  In his testimony, Dr. Montoya explained that Ms. Lerwick had researched the facility and Dr. Montoya had relied on the information she presented when he recommended that Ms. Lerwick's insurance company pay for the therapy.  Tr. 1047-48, 1062-64.[11]  Further inquiry of Dr. Montoya revealed that he was recommending some therapies (such as physical therapy) that were "reasonably necessary" for B.L. and other therapies (such as Sky Therapy) that might optimize B.L.'s life.  See Tr. 1079-85.

If frequent turning throughout the night were reasonably necessary for B.L.'s health, then it is likely that Dr. Montoya, Dr. Sankar, and/or the supervisors at Premier Healthcare Services would have made that recommendation much earlier.  B.L. seems not to be at high risk for developing bed sores because he changes positions frequently during the day.  Sometimes, he is in a wheelchair.  Sometimes, he is upright in a walker.  Sometimes, he is on a mat.  B.L. has the ability to roll over.  Exhibit 139 (2014 IEP) at 5 (describing B.L.'s gross motor development).  He has voluntary control over some muscles, such as those associated with reaching for a desired toy or activating a switch.  Id.; exhibit 95 (April 26, 2011 Vineland Adaptive Behavior Scales) at 11, 28.  These abilities distinguish B.L. from a more severely neurologically impaired person who is confined to a bed for 24 hours a day.  See exhibit X (Dr. Lubens: "cerebral palsy

---

[11] Dr. Lubens stated that Sky Therapy was unlikely to help B.L.  He noted that the California Child Services has not empaneled this program.  Tr. 1314.

patients like [B.L.] move and adjust position during periods of rest and sleep").[12] Thus, the introduction of an attendant whose job is to turn B.L. throughout the night is not reasonably necessary and could work only to disrupt B.L.'s sleep.

The lack of a nighttime attendant does not leave B.L. without any protection against bed sores and/or skin infections. An LVN will spend time (8 hours) with B.L. every day. The nurse's routine duties include an evaluation of B.L.'s skin. See exhibit 107 at PDF 10 (Premiere Healthcare Services plan of care stating "LVN to perform skilled observation . . . every shift and PRN.") This daily monitoring by a licensed medical professional should ensure that if any redness, infection, or bed sores start to develop, B.L. will receive treatment quickly. However, given that B.L. has not developed any bed sores, their occurrence is not likely.

### C.    Synopsis on Attendant Care

In sum, California provides approximately 76 hours of care weekly to assist Ms. Lerwick, including 40 hours of LVN care and 36 hours of unlicensed care. Exhibit 107; Tr. 1112-14, 1253, 1424. The school district provides additional LVN coverage. Ms. Lerwick has proposed to change this system so that she may employ an LVN for 24 hours per day.

Ms. Lerwick has not established that B.L. reasonably requires an attendant 24 hours per day. She has not established that a home health aide for overnight turning is reasonably necessary to prevent bed sores. She has also not established that 24 hour coverage of an LVN is reasonably necessary. This request was based upon the risk of seizures and risk of aspiration. But, the Secretary's plan adequately accounts for B.L.'s current and reasonably anticipated needs.[13]

---

[12] Dr. Montoya testified that "[B.L.'s] at risk for skin infections because he is immobile." Tr. 1039. However, numerous records indicate that B.L. has an ability to move at least in some ways. An example relevant to his risk of developing bed sores is that B.L. has the ability to roll over. In light of these records, Dr. Montoya has not explained why he stated that B.L. is "immobile."

[13] As discussed earlier, the school system provides LVN coverage while B.L. is attending school. The Secretary does not have to provide compensation to duplicate this service. However, the Secretary must provide sufficient compensation for Ms. Lerwick to retain an LVN for eight hours per day on days when B.L. is not attending school. The "days when [B.L.] is not attending school" includes not only the days in which the school is closed (weekends, holidays,

(continued...)

## V.  Long-term Placement

The second disputed issue is where B.L. should live when he is older than 25.  Ms. Lerwick maintains that B.L. should remain in her house where she would care for him with assistance from licensed vocational nurses.  For this proposition, Ms. Lerwick cites to section 15(c) of the Vaccine Act: "The amount of any compensation for residential and custodial care and services expenses under subsection (a)(1) of this section shall be sufficient to enable the compensated person to remain living at home."  42 U.S.C. § 300aa—15(c).  In contrast, the Secretary has proposed a plan in which B.L. would live in a residential facility eventually.  The primary statutory basis for the Secretary's position is a requirement that the special master award compensation for various expenses, including residential and custodial care and services expenses, that are "reasonably necessary."  42 U.S.C. § 300aa—15(a)(1)(A)(iii)(I).  A secondary statutory basis for the Secretary's position is found in section 15(f).

Thus, the parties have a basic disagreement about the meaning of the Vaccine Act.  This question of law about how the statute should be interpreted is resolved first.  For the reasons explained in section A., the Secretary has not presented any persuasive reason for going beyond the plain meaning.  Thus, Ms. Lerwick's proposed interpretation is accepted and the award of compensation shall be in accord with her request.

Nevertheless, an alternative factual analysis is presented in section B.  This evaluation assumes, simply for the sake of judicial efficiency, that the Secretary's proposed interpretation of the Vaccine Act is correct.  Under this assumption, the Secretary has presented a reasonable plan.

### A.  Whether the Vaccine Act Requires Sufficient Compensation for B.L. to Remain in Ms. Lerwick's Home

The parties' competing arguments raise a question of statutory interpretation.  Although special masters are not entitled to any deference in interpreting a statute, <u>Cloer v. Sec'y of Health & Human Servs.</u>, 654 F.3d 1322,

---

portions of the summer) but also an estimated 30 days per school year that B.L. misses school.  <u>See</u> exhibit 135 at 2, 6.

1330 (Fed. Cir. 2011) (en banc), the Federal Circuit has, in a series of cases interpreting the Vaccine Act, offered instructions in how to interpret the Vaccine Act.[14]   An interpretation of this statute, like all statutes, "must begin with the plain language of the statute."  Id.

Here, section 15(c) is straightforward.  Congress has directed special masters to award compensation that "shall be sufficient to enable the compensated person to remain living at home."  The simplicity of this phrasing presents an example when "the language is clear and fits the case, the plain meaning of the statute will be regarded as conclusive."  Schindler v. Sec'y of Health & Human Servs., 29 F.3d 607, 611 (Fed. Cir. 1994) (citation and internal quotation marks omitted).

The Secretary does not tackle directly section 15(c)'s seemingly plain language.  At best, the Secretary cites to the "reasonably necessary" phrase found in section 15(a) and a series of cases implementing that provision.  Resp't's Resp. to Pet'r's Mot. for Partial Summary Judgment, filed July 29, 2013, at 3-4.  The Secretary's implicit argument is that the "reasonably necessary" qualification restricts the compensation for residential care.  However, the Secretary does not explain why a limitation in section 15(a) should be read into section 15(c).

"It is a well-settled principle of statutory interpretation that a 'statute is to be construed in a way which gives meaning and effect to all of its parts.'" Heinzelman v. Sec'y of Health & Human Servs., 681 F.3d 1374, 1377 (Fed. Cir. 2012) (citations omitted).  The way to harmonize the two paragraphs is to interpret them as a mandate to special masters to award compensation "reasonably necessary" "to enable the compensated person to remain living at home."

Here, the Secretary's proposed plan in which the compensation would not allow Ms. Lerwick to keep B.L. in her home after he reaches age 25 (exhibit F at 8) is contrary to the language in 15(c).  While the Secretary's plan accommodates Ms. Lerwick's wish that B.L. remain in her home for the next 15 years, the Secretary seems to be adding a qualification to section 15(c) that is not present in the statute's text.  In the Secretary's view, the injured person may remain at home as long as the injured person's parent is (or parents are) capable of caring for the person at home.  But, judicial officials should not add words to a statute.  Kyocera Wireless Corp. v. Int'l Trade Comm'n, 545 F.3d 1340, 1356 (Fed. Cir. 2008);

---

[14] The parties' briefs lack any well-developed arguments regarding how statutes should be interpreted.

Adam Sommerrock Holzbau, GmbH v. United States, 866 F.2d 427, 429 (Fed. Cir. 1989).

As a matter of policy, the Secretary's proposal to award compensation to permit vaccine-injured people to remain at home only as long as someone can care for them makes some sense. But, as a matter of statutory interpretation, the Secretary's argument lacks force. A court's "duty is limited to interpreting the statute as it was enacted, not as it arguably should have been enacted." Beck v. Sec'y of Health & Human Servs., 924 F.2d 1029, 1034 (Fed. Cir. 1991).

Moreover, the Secretary has not presented any persuasive basis for concluding that Congress intended a different result. The overall structure of section 15 suggests that paragraph (a) is a general authorization of compensation. See Heinzelman, 681 F.3d at 1379. Then, paragraph (c) authorizes compensation in the specific context of living at home. See Griglock v. Sec'y of Health & Human Servs., 687 F.3d 1371, 1376 (Fed. Cir. 2012) (different statutory provisions have different purposes). Citing three Supreme Court cases, the Federal Circuit has stated a "basic tenet of statutory construction is that a specific statute takes precedence over a more general one." Arzio v. Shinseki, 602 F.3d 1343, 1347 (Fed. Cir. 2010). The specificity of section 15(c) is another reason why the Secretary's reliance on section 15(a) is unavailing.

Even less helpful is the Secretary's citation to section 15(f)(4)(A). See Resp't's Resp., filed July 29, 2013, at 4-5. That paragraph discusses the forms compensation may take. The particular portion on which the Secretary relies authorizes a special master to order compensation be used "to purchase an annuity or otherwise be used, with consent of the petitioner, in a manner determined by the special master to be in the best interests of the petitioner." Section 15(f)(4)(A). The limited reference to the petitioner's "best interest" in the very specific circumstance contemplated by section 15(f)(4)(A) undermines the Secretary's attempt to view the "living at home" provision of section 15(c) as modified by the "best interest" standard. See Slattery v. United States, 635 F.3d 1298, 1323 (Fed. Cir. 2011) (en banc) (discussing the canon of statutory expressio unius est exclusion alterius). The Act's inclusion of petitioner's "best interest" in section 15(f)(4)(A) supports an inference that Congress intentionally excluded the same from section 15(c).

Thus, in terms of the text of the Vaccine Act, the language is plain. As such, a judicial officer should follow the language as it is written.

Despite the clarity of the language, the Secretary urges a review of the legislative history.  The legislative history is actually at the forefront of the Secretary's brief, appearing in the first paragraph of her argument.  Resp't's Resp., filed July 29, 2013, at 2.  The Secretary, however, does not offer any explanation for why the legislative history should be considered.[15]  Although normally, "going behind the plain language of a statute in search of a possibly contrary congressional intent is 'a step to be taken cautiously,'" the Federal Circuit has sanctioned such investigations for the Vaccine Act because it is a complex legislative scheme.  Flowers v. Sec'y of Health & Human Servs., 49 F.3d 1558, 1560 (Fed. Cir. 1995).[16]

The Secretary relies upon this portion of the legislative history:

> *Residential and Custodial Care and Service*.-Any compensation award for residential and custodial care and service expenses is to be sufficient to allow the compensated person to remain living at home.  This provision is not intended to prevent injured persons from receiving appropriate institutional care if they and their families request such services; neither is it intended to provide for the payment of family living expenses, the purchase of a home, or the construction of a major addition.  The Committee intends that this provision allow for in-home medical, rehabilitative, and custodial care, and such modifications to existing physical facilities (such as bathroom facilities) as are necessary to

---

[15] At one point, the Secretary states "[w]hile the petitioner argues that the provision in question [section 15(c)] is unambiguous, . . . the case law says otherwise."  Resp't's Resp., filed July 29, 2013, at 5.  This hint is the closest the Secretary comes to arguing that section 15(c) is ambiguous.  But, even if the Secretary had argued more directly that there is an ambiguity, the Secretary's argument, by itself, does not establish the ambiguity.  See Heinzelman, 681 F.3d at 1382-83 (rejecting the government's argument that section 15(a) of the Vaccine Act was ambiguous with respect to whether Social Security Disability Insurance payments should offset a petitioner's claim for diminished earning capacity).

[16] At issue in Flowers was the relationship between actions for compensation for allegedly vaccine-caused injuries pending in state court and the opportunity to file a petition seeking compensation through the Vaccine Act.  The Federal Circuit has not discussed whether section 15(c) is another aspect of the "complex legislative scheme" described in Flowers.

> ensure that injured persons are not required to be
> institutionalized for purely economic reasons.

H.R. Rep. No. 99-908, at 3, 5 (1986), reprinted in 1986 U.S.C.C.A.N. at 6344,
6362.

Despite the prominence of the legislative history in the Secretary's brief, the
Secretary does little to analyze this passage.  Drawing on the final line, the
Secretary states that the "legislative history makes clear that the purpose of the
provision is to ensure that injured persons are not required to be institutionalized
for purely economic reasons."  Resp't's Resp., filed July 29, 2013, at 3.  The
Secretary continues:  "However, economic reasons can surely be considered by the
special master along with other factors bearing on the best interest of the child.
These factors have been applied by special masters since the inception of the
Vaccine Program."  Id.  Here, the ground on which the Secretary stands is less
firm.

To the extent this legislative history differentiates between allowed and
disallowed items, the type of compensation Ms. Lerwick is requesting falls within
the allowed category.  The committee interpreted the proposed legislation as not
permitting "payment of family living expenses, the purchase of a home, or the
construction of a major addition."  Ms. Lerwick is not requesting any of those
items.  Instead, Ms. Lerwick is requesting that she receive compensation to pay for
assistants to help her in caring for B.L. at home.[17]  Whether nurses or home health
aides, these assistants fall within the permitted category of "in-home medical,
rehabilitative, and custodial care."

Therefore, the legislative history tends to support the position of Ms.
Lerwick and tends to undermine the position of the Secretary.  When the
legislative history is not clearly contrary to the words expressed by Congress, the
plain meaning of the statute controls.  Youngblood v. Sec'y of Health & Human
Servs., 32 F.3d 552, 555-56 (Fed. Cir. 1994); see also Heinzelman, 681 F.3d at
1379-80 ("the legislative history does not alter our reading of the plain language of
the statute").

---

[17] As discussed in the preceding section, the parties dispute the qualification level of
these assistants.  Ms. Lerwick prefers 24-hour coverage of licensed vocational nurses.  The
Secretary supports a mixture of nursing care and home health aide care.

In addition to the legislative history, the Secretary also relies upon four decisions from special masters discussing section 15(c) written in 1990. See Resp't's Resp., filed July 29, 2013, at 6-8. These decisions do not constitute binding precedent. Hanlon v. Sec'y of Health & Human Servs., 40 Fed. Cl. 625, 630 (1998), aff'd in non-relevant part, 191 F.3d 1344 (Fed. Cir. 1999). These decisions were issued before the Federal Circuit began interpreting the Vaccine Act. These old decisions from special masters do not explain why the plain meaning of section 15(c) should not be implemented, and, therefore, lack persuasive value. Consequently, the undersigned respectfully declines to follow them.

In sum, the statute authorizes that compensation "shall be sufficient to enable the compensated person to remain living at home." Ms. Lerwick has demonstrated that for B.L. to remain living at home, she requires assistance from nurses and home health aides for the remainder of B.L.'s life. She is awarded compensation for this purpose.

**B.    Whether the Secretary's Plan Would Provide "Reasonably Necessary" Care for B.L, if a Different Ruling Were Made on the Legal Issue Discussed Above.**

As just recognized, this interpretation of the Vaccine Act is at odds with previous cases. If an appellate court were to disagree with the preceding analysis of the statute, then the parties and the higher tribunal might benefit from knowing whether a different interpretation would affect the outcome for Ms. Lerwick. See Zatuchni v. Sec'y of Health & Human Servs., 73 Fed. Cl. 451, 452 (2006) (noting the special master "commendably" made alternative factual findings in the context of a "difficult" legal question and adopting the special master's findings), aff'd, 516 F.3d 1312 (Fed. Cir. 2008). Thus, the undersigned will address an alternative scenario if the Secretary's proffered interpretation of the Vaccine Act were correct. Based on such an alternative interpretation of the statute, the outcome for Ms. Lerwick would change. If compensation for the injured person to remain living at home were limited to amounts that are "reasonably necessary," then the Secretary's plan would be adopted.

What is "reasonably necessary" appears to be a very fact-intensive determination. See section III., above. For example, B.L.'s current living environment, which was described in section I., above, is an important consideration. Other factors include the options the Secretary has proposed as alternatives to living in Ms. Lerwick's home. The Secretary's plan attempts to

account for the inevitable physical changes that Ms. Lerwick and B.L. will experience over the next decades.  These considerations are reflected in the recommendations from the doctors who have seen B.L. and the two life care planners.

One important factor is the set of predictions about the child's and his parent's life expectancies.  Pursuant to an August 7, 2013 order, the Secretary submitted information about the number of years B.L. is expected to live.  Four insurance companies calculated his rated age and the average of these estimates was approximately 25 years.  Exhibit R.  Dr. Lubens similarly predicted that B.L. may live another 30 years.  Tr. 1317.[18]

The parties also presented information about Ms. Lerwick's life expectancy. (She was almost exactly 40 years old when she gave birth to B.L.)  Her current life expectancy is between 33 years (exhibit S, taken from National Vital Statistics Report) and 36 years (exhibit 123, taken from Social Security Administration). Under either prediction, Ms. Lerwick is expected to live longer than B.L.

Although Ms. Lerwick may remain alive, she will inevitably become weaker and more infirm as she ages.  The challenges for Ms. Lerwick in moving or carrying B.L. will become greater as he ages through adolescence and into adulthood.  Everyone agreed that B.L. will gain weight.  Dr. Montoya, for example, was concerned that B.L.'s growth will interfere with his mother's ability to move him.  Tr. 1074.  Ms. Fox estimated that in a few years, B.L. would weigh at least 75 pounds and Ms. Woodard did not dispute this assessment.  Tr. 1532, 1590.  Ms. Fox appeared particularly sensitive to the possibility that Ms. Lerwick did not grasp how difficult moving a person of this weight will be.  Tr. 1533. Thus, the Secretary questions whether Ms. Lerwick will be able to care for all of B.L.'s physical needs in her own twilight years and proposes B.L.'s placement in a residential home.  See Resp't's Posthr'g Br., filed Jan. 27, 2104, at 16.

Because the Lerwicks live in California, many options are available to them. The Secretary presented the testimony of Michael Cutchshaw, a director of operations for ResCare.  ResCare operates homes for developmentally disabled people throughout the country and Mr. Cutchshaw's area of responsibility includes

---

[18] Ms. Woodard, Ms. Lerwick's life care planner, was unaware of B.L.'s life expectancy until Dr. Lubens testified.  Tr. 1592.

California.  Tr. 1361-62.  Mr. Cutchshaw spoke knowledgeably about the different arrangements available and his testimony greatly assisted in clarifying the issues.

California classifies different types of facilities.  See exhibit 122.  The most relevant ones for B.L. are two closely-related types, intermediate care facilities / developmentally disabled – nursing and intermediate care facilities / developmentally disabled - habilitative.[19]  These are typically abbreviated ICF/DD-N and ICF/DD-H.  The differences between "-N" and "-H" primarily concern the number of hours nurses are available.  Tr. 1363.

The federal government certifies ICF/DD-N institutions and the State of California licenses them.  Typically, six individuals live in one residence. Residents usually have no ability to walk, limited verbal abilities, and seizures.  Tr. 1362-65.

The staff does not live with them, but there is 24-hour care.  Employees at these facilities are trained to provide medication even if they are not licensed nurses.  The staff can also suction residents as needed.

There are several advantages for placement at an ICF/DD-N institution. Staff people, such as physical therapists and occupational therapists, get to know the resident.  Tr. 1373.  B.L. would be in an environment with other people who have abilities similar to his abilities.  The structured environment of an established facility may open new opportunities to B.L.  Tr. 1534 (Ms. Fox).  For example, Mr. Cutchshaw stated that ResCare's philosophy is that every person, regardless of their limitations, possesses some ability to perform some work-like job.  Tr. 1375, 1389-90.  Ms. Fox has proposed that an ICF/DD-N is an appropriate level of care for B.L. after he reaches age 25.  Exhibit L at 3.

Ms. Lerwick, with support from Ms. Woodard, opposes a plan anticipating placing B.L. in a residential home in approximately 15 years.  Tr. 1235-43 (Ms. Woodard), 1402 (Ms. Lerwick).  The primary advantage for B.L. is that he will continue his connection with his mother.  Tr. 1235.  Ms. Woodard maintains that

---

[19] In exhibit 122, Ms. Lerwick proposed that if, contrary to her preference for in-home nursing care, compensation funded a residential placement, then B.L. should be placed in a nursing facility / acute hospital ("NF/AH").  However, as the Secretary noted, after the respondent presented evidence about the criteria for admission to this type of facility, "petitioner did not raise the suggestion of a continuous care facility."  Resp't's Posthr'g Br. at 19.  Ms. Lerwick's reply also does not advocate for placement in an NF/AH facility.

remaining with his mother will offer B.L. "the highest quality of life he's going to have." Id.

If the standard for awarding compensation focused exclusively on the absolutely best life for B.L., then Ms. Woodard's approach might be more creditable. However, if special masters are authorized to award compensation for only "reasonably necessary" services, it is difficult to see how the additional costs for 24-hour care at Ms. Lerwick's home support the negligible, if any, improvement anticipated in B.L.'s life. Although a transition to a residential home may separate Ms. Lerwick and B.L. to some degree, Ms. Lerwick can ameliorate any negative consequences by visiting B.L. as often as she would like. See Tr. 1373 (Mr. Cutchshaw).

Significantly, under Ms. Fox's plan, B.L. would not leave Ms. Lerwick's house until he is 25 and she is 65. Ms. Fox considered that B.L. is eligible for extended school support until he is age 23. The assistance from the school system lightens Ms. Lerwick's responsibility because for several hours a day, another adult is responsible for B.L.'s immediate needs. Ms. Fox showed further sensitivity to Ms. Lerwick's position by proposing two transitional years during which Ms. Lerwick would require more assistance to offset the lack of support from the school system. Tr. 1532. In these two years, Ms. Lerwick would have the benefit of 8 hours of an LVN as well as a live-in attendant. Exhibit L at 3.

This transitional stage, in Ms. Fox's plan, ends coincidently when Ms. Lerwick reaches age 65, which is traditionally an age for retirement. Thus, there is a natural flow to the events in Ms. Fox's plan.

In sum, if special masters may consider a variety of factors in considering the long-term placement of a vaccine-injured person, then the Secretary's plan offers a reasonable alternative for B.L. Specific factors that show the reasonableness of the Secretary's approach include: (1) the plan allows for a gradual (not abrupt) transition, (2) B.L.'s transition from living with his mother to living in a residential facility occurs at an age when his mother is older, (3) the residential facility is located in B.L.'s home state of California, which has devoted resources to maintaining residential facilities for developmentally disabled people for many years, and (4) the living environment will not greatly affect B.L.'s well-being.

### C.      Synopsis: Long-Term Placement

As previously stated, the Secretary's plan is based upon her view that "the care provided by a reputable California provider will meet the Act's reasonably necessary standard."  Resp't's Posthr'g Br. at 16-17.  However, for the reasons explained above in section A, the "reasonably necessary" standard is not the standard used for determining the amount of compensation sufficient to enable the injured person to live at home.  Consequently, the Secretary's plan is not adopted.

Instead, the plan proposed by Ms. Fox for when B.L. is age 23-24 is continued for the remainder of his life.  For attendant care, Ms. Lerwick will receive sufficient compensation for her to retain an LVN for 8 hours and a live-in attendant.  Exhibit L at 3.

## VI.    Conclusion

This ruling is intended to resolve the disputes regarding the damages to which Ms. Lerwick is entitled.  The parties are ORDERED to incorporate this ruling into a proffer that will be the basis for a decision awarding Ms. Lerwick compensation.

To facilitate this process and to address any questions, a status conference will be held on **Monday, July 21, 2014 at 2:00 P.M. Eastern Time**.  The Office of Special Masters will initiate the telephone call.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master

31